**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS  DIVISION**

| | |
|---|---|
| **TODD DAVIDSON, WILBERT WIGGINS, GEORGE DOUGLAS, JR., CHARLES MAGEE, DARON THOMPSON, EUGENE SMITH, GEORGE RODGERS, KENTON SMITH, SIDNEY WILLIAMS and JIMOTHY AMOS a/k/a TIMOTHY AMOS, on behalf of themselves and others similarly situated,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| **Plaintiffs,** )<br>)<br>) | **1:03-CV-1882-SEB-JPG** |
| **vs.** )<br>) | |
| **CITIZENS GAS & COKE UTILITY,** )<br>) | |
| **Defendant.** | |

**ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the court on the parties' cross motions for summary judgment.  For the reasons set forth in this entry, we hold that Plaintiffs' Motion for Partial Summary Judgment should be granted and that Defendant's Motion for Summary Judgment should be granted in part and denied in part.

*Factual Background*

Eight of the ten Plaintiffs are hourly employees of Defendant, Citizens Gas & Coke Utility ("Citizens") who work in its manufacturing division and are represented by the International Brotherhood of Electrical Workers ("IBEW").  Plaintiff Sidney Williams applied for employment with Citizens during 2002 and again in 2004, but was not hired.  Plaintiff

Jimothy Amos sought, but was denied employment with Citizens in 2003. All ten of the Plaintiffs are African-Americans who took, at least once, a written test known as the work competency assessment or "WCA", which Citizens used at the time to screen inter-division transfer and promotion candidates as well as applicants. Citizens operates a gas division and thermal division in addition to its manufacturing division. Each division stands as a separate bargaining unit for non-exempt employees and, at least during the relevant time period, seniority in one division did not transfer to the others. If an employee was hired prior to June 28, 1987 who wanted to transfer or bid on a job in another division, he had to pass a test, which, beginning in 1999, was the WCA. Generally, if no employee from within the division where an opening existed wanted the job, it was awarded to an interested person possessing the most seniority in another division. To secure the position, that person had to be under no current disciplinary constraints and had to have successfully passed the WCA. Employees hired after June 28, 1987, however, could not transfer into other divisions regardless of their scores on any selection tests.

The WCA was developed by Roland Guay, a Purdue University professor. Dr. Guay and Citizens assert that the test was intended to allow Citizens to measure a person's ability to take on certain jobs. Unless a test-taker scored at a certain level, he or she was deemed ineligible for hire, promotion or transfer to numerous positions.[1] The required scoring levels for various jobs were set by Dr. Guay.

---

[1] A score of 595 was necessary to qualify for a supervisory position, 570 for customer relations and 542 for nearly all other open positions.

Plaintiffs claim that the WCA had a discriminatory impact on African-Americans and, as a result, they were injured, either by their inability to compete equally for positions in other divisions or by being deemed ineligible for specific positions for which they had applied and which they otherwise would have received. Each Plaintiff asserts a claim of both disparate impact and disparate treatment, under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, as well as a claim of discrimination under 42 U.S.C § 1981. We previously granted partial summary judgment in Citizen's favor with respect to any claim of disparate impact pursued under 42 U.S.C. § 1981. Inasmuch as a recovery under § 1981 requires a showing of wrongful intent, a disparate impact claim is not available under that statute. *Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 312 (7th Cir. 1996). Plaintiffs' request for class certification was denied as well.

Citizens now seeks summary judgment on all the remaining claims brought against it by all Plaintiffs. Plaintiffs concede summary judgment is appropriate with respect to the claims of two job applicants, Jimothy Amos and Sidney Williams.[2] However, Plaintiffs vigorously dispute that Citizens is entitled to summary judgment with respect to the claims of the other eight and, in fact, seek summary judgment in their favor on each of their disparate impact claims.

### Summary Judgment Standard

In addressing cross motions for summary judgment, we may grant summary judgment (in

---

[2] Since Amos and Williams have conceded summary judgment, our reference to "Plaintiffs" from this point forward is to those eight remaining Plaintiffs who took the WCA as a prerequisite to their promotions.

-3-

whole or in part) or deny (in whole or in part) either or both parties' motions.  The standard for determining summary judgment is unchanged from that which applies when only a single party has moved for it.  Summary judgment is available if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  To determine whether any genuine factual issue exists, the Court examines the pleadings and the proof as presented in depositions, answers to interrogatories, admissions, and affidavits made a part of the record. *First Bank & Trust v. Firstar Information Services, Corp*., 276 F.3d 317 (7th Cir.2001). The Court also draws all reasonable inferences from undisputed facts in favor of the non-moving party and views the disputed evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986).  However, the non-moving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, the non-movant  must go beyond the pleadings to support their contentions with properly admissible evidence.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## *Analysis*

Title VII and § 1981 both prohibit discrimination.  Title VII is directed specifically at employment relationships, while 42 U.S.C § 1981 prohibits discrimination with regard to the making and enforcement of contracts, including employment contracts.  There is an overlap in the employment situation and the same standards governing liability for intentional discrimination  under Title VII apply to § 1981 claims.  *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998).   However, as we mentioned earlier, a successful claim under § 1981 requires a showing of intentional discrimination, while Title VII provides a cause

of action for intentional discrimination and discrimination which may not be intended, but which results from otherwise facially neutral actions. *See Melendez v. Illinois Bell Telephone Co.*, 79 F.3d 661 (7th Cir. 1996)(noting distinctions between some claims made under Title VII and claims made pursuant to 42 U.S.C. § 1981 and affirming verdict of liability on Title VII disparate impact claim where no liability was found under § 1981). In this matter we look first at those claims that do not require a showing of intent.

Disparate Impact Claims

In order to establish a prima facie case of discrimination under a disparate impact theory, a plaintiff must show that a facially neutral employment practice, in this case the WCA, had a significantly discriminatory impact. *Connecticut v. Teal*, 457 U.S. 440, 446 (1982); *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 265 (4th Cir. 2005). If such a showing is made, then the burden shifts to the employer to demonstrate that the employment practice has a manifest relationship to the particular employment in question. *Teal*, 457 U.S. at 446-47 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)). If the employer satisfies that required showing, a plaintiff may still prevail if he shows that the employer was using the practice as a mere pretext for discrimination. *Teal*, 457 U.S. at 446-447; *Anderson*, 406 F.3d at 265. A plaintiff employee also prevails if he can show that there is an equally valid substitute practice or, in this case, screening methodology available which would be less discriminatory than the one at issue and the employer refuses to utilize it. 42 U.S.C. § 2000e-2(k)(1)(A)(ii).

Where the challenged practice is an examination that is being used as a bright-line barrier to promotion (that is to say, an employee may only be promoted if he passes the test), it does not suffice as a defense that the employer might be able to demonstrate statistically acceptable bottom–line results from the promotion process and such results would not defeat a prima facie showing by plaintiff(s).

> In short, the District Court's dismissal of respondents' claim cannot be
> supported on the basis that respondents failed to establish a prima facie case of
> employment discrimination .... The suggestion that disparate impact should be
> measured only at the bottom line ignores the fact that Title VII guarantees these
> individual respondents the opportunity to compete equally with white workers on
> the basis of job-related criteria. Title VII strives to achieve equality of opportunity
> by rooting out "artificial, arbitrary, and unnecessary" employer-created barriers to
> professional development that have a discriminatory impact upon individuals.

*Teal*, 457 U.S. at 451.

Here, Plaintiffs have provided statistical evidence that African-Americans scored disproportionately lower than others taking the WCA, thereby reducing disproportionately their chances of promotion.[3] Generally, if a minority group passes a selection test at a rate of 80% or less than the pass-rate of non-minorities as is the situation here, EEOC guidelines deem disparate impact established. 29 C.F.R. § 1607.4(D). Consistent with the approach taken by most other courts, the Seventh Circuit has often relied on the EEOC's "four-fifths" rule as a useful

---

[3]As Plaintiffs have done in their briefs, we too use the term "promotion" in its broadest sense, encompassing transfers, promotions or other procedures leading to an employee obtaining a position with higher pay, demonstrably preferable work conditions or greater opportunity for advancement. It has been asserted, and certainly little effort expended to dispute, that holding an hourly position at Citizens gas operations division was preferable to holding a similar position at the company's manufacturing division, primarily due to a more pleasant work environment. It is uncontested that the manufacturing division has a higher percentage of African-American employees.

benchmark in analyzing disparate impact testing cases; *see Allen v. City of Chicago*, 351 F.3d 306, 310 (7th Cir. 2003); *Bew v. City of Chicago,* 252 F.3d 891, 893 (7th Cir. 2001); *Cox v. City of Chicago*, 868 F.2d 217, 220 (7th Cir. 1989). Clearly, Citizens can not deny that the test results here fell within those guideline ranges. Given that the pass rate statistics provide the Plaintiffs with a decided advantage in establishing their prima facie case, Citizens has raised two, alternate grounds in their attempt to defeat the disparate impact claims at this juncture.

The clearer of their two arguments is based on an analysis of the testimony of Citizens's own expert, Dr. Gerald Barrett. Faced with the objective statistical analysis of the WCA pass/fail rates and the opinion of Plaintiffs' expert, Dr. Charles Cranny, that the test had not been properly validated, Citizens counters with the report of Dr. Barrett which advances alternative reasons beyond Plaintiffs' failures of the WCA to explain why none of the Plaintiffs received the job he bid for. After reviewing depositions, documents and professional literature, Dr. Barrett states that he "determined there were no statistically significant differences in selection rates based on race for all but one of the job postings" for which any Plaintiff applied. Dr. Barrett maintains that he reviewed each relevant selection decision involving a Plaintiff and determined that "the process involved a number of factors . . . (and that he) found no evidence that the personnel decisions were based on race rather than other valid factors."

Setting aside for the moment the fact that Dr. Barrett's analysis draws only slightly on his own testing procedures and statistical expertise before venturing forth into the realm of fact finder, what small amount of "expert analysis" he does offer is primarily a round-about attempt to revisit the "bottom-line" defense which the Supreme Court has declared unavailable. *Teal*,

457 U.S. at 451.  If a "must pass" selection test is given and each of the Plaintiffs failed the test,

the fact that Dr. Barrett found "no statistically significant differences in selection rates based on

race" for the job postings Plaintiffs were seeking to fill is of absolutely no relevance, given the

holding in *Teal.*   No significant difference "in selection rates based on race," as Dr. Barrett puts

it, is simply another way of saying that Citizens had a favorable "bottom-line."  Even if true, that

fact does not prevent an African American Plaintiff from establishing a prima facie case of

disparate impact, assuming that he failed the test, and that the test excluded African-Americans

disproportionately, and that failure eliminated him from consideration for the promotion so long

as he was unable to pass the test.

     The second reason proffered by Citizens, both in an effort to defeat Plaintiffs' motion as

well as to secure summary judgment in its favor, has more convincing legal underpinnings than

its first argument.  Citizens challenges the standing of each Plaintiff to bring a disparate impact

claim in view of the Seventh Circuit's requirement that an individual Title VII plaintiff, who

alleges disparate impact in connection with a hiring or promotion decision, must establish that he

was otherwise qualified for the position he sought.  *See Melendez v. Illinois Bell Telephone Co.,*

79 F.3d 661, 668 (7th Cir. 1996); *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1255 (7th Cir.

1990); *Carpenter v. Board of Regents of University Of Wisconsin System*, 728 F.2d 911, 915 (7th

Cir. 1984).  While at first reading the Supreme Court decision in *Teal* appears to conflict with

this requirement, a closer examination of the reasoning underlying the Seventh Circuit decisions

suggests the two approaches are not inconsistent especially in light of the part of the holding in

*Teal* that provides that losing "the opportunity to compete equally" is, in itself, an injury.  *Teal,* 457 U.S. at 451.

The decision in *Carpenter v. Board of Regents of University of Wisconsin System*, 728 F.2d 911 (7th Cir. 1984), was handed down by our court of appeals almost immediately following the Supreme Court decision in *Teal*.  In *Carpenter*, the Seventh Circuit voiced its understanding that a plaintiff in an individual disparate impact case must be able to prove that a promotion was denied because of the discriminatory requirement and not for some other reason.  In *Carpenter,* the plaintiff had no clear evidence demonstrating that the challenged employment policy had such a discriminatory impact, since after having been denied tenure, he was fired following his seventh year as a professor at the defendant university.  *Id*. at 911-912, 914.  The evidence established that he was denied tenure because his scholarship, which was one of three areas of evaluation for tenure, was viewed as deficient.  *Id*. at 913.  Carpenter claimed that the tenure process which the university followed had an adverse impact on all African-Americans, of which he was one, but he lacked any statistical evidence to prove that allegation.  *Id*. at 914.  More specifically, Carpenter alleged that the unwillingness of the university to extend the deadline for tenure consideration beyond seven years had an adverse impact on him because his added responsibilities which were imposed on him by the university in connection with his role in the newly created African-American Studies Department, had usurped time he would otherwise have had available to complete the tenure requirements.  *Id*.

After rejecting the plaintiff's disparate impact claim for lack of evidence of discriminatory impact, the Seventh Circuit noted that plaintiff had also failed to show that the

extension of the tenure track beyond seven years would have cured whatever deficiency existed in his scholarship. *Id*. at 914-915.  In reaching this conclusion, the court stated:

> We agree with the district court that a plaintiff in a disparate impact case must show that he or she was really injured by the policy alleged to have had a disparate impact.  For example, a plaintiff denied a promotion could not challenge a promotion test as discriminatory, if promotion was denied for a reason completely unrelated to the test, such as lack of experience.  Here, the district court determined that Carpenter failed to prove that any tendency to discriminate inherent in the seven year rule or the tenure standards really affected him.  He simply failed to prove that the practices of which he complained had the discriminatory effect of which he complained.  Even if the refusal to waive the seven year rule may appear overly strict, on these facts Title VII provides no remedy.

*Id.* at 915.  The factual circumstances in *Carpenter* involved a single plaintiff, a single promotion and a lack of evidence that the employment policy had had any discriminatory impact, as a consequence of which the Seventh Circuit ruled no actionable injury based on a disparate impact theory had been established.

Thereafter, the Seventh Circuit examined a claim by an individual plaintiff in another disparate impact case in *Gilty v. Village of Oak Park*, 919 F.2d 1247, (7th Cir. 1990).  Gilty was a police officer who, on more than one occasion, had misrepresented his academic credentials to his employer.  On one such occasion, the misrepresentation was made during an oral interview conducted in connection with his effort to be promoted to Sergeant.  *Id*. at 1248-49.  Though his interview score was acceptable (his misrepresentations were not discovered until later) and his score on a written exam was comparatively strong, he was given the lowest score of all the candidates in his performance evaluation, which was the third of the three scored criteria for promotion.  *Id*. at 1249.  The plaintiff was not promoted nor was any other African-American officer who had applied at that time.  *Id*.  He brought suit alleging discrimination based on both

-10-

pattern and practice disparate treatment and the disparate impact of the subjective components of the promotion process. No class certification was sought by plaintiff on this claim. *Id.*

Having subsequently discovered the inconsistent misrepresentations made by the plaintiff regarding his academic history, the Village successfully defended the decision of its police department not to promote Gilty, arguing that his lack of honesty disqualified him from consideration for promotion. With respect to his disparate treatment claim, plaintiff could not demonstrate the requisite element that he was "qualified" for the promotion or that there was direct evidence of discrimination against him. *Id.* at 1252. His disparate impact claim also failed on several fronts. *Id.* at 1254-55. After discussing the ways in which plaintiff's statistical evidence was lacking, the Seventh Circuit opined that the evidence was irrelevant in any event where an individual has brought suit but could not establish that he was a qualified applicant for the promotion he was seeking. *Id.* at 1255. "If Gilty is to achieve individual relief, then he must establish that his individual circumstances entitle him to that relief. He cannot rely upon the qualifications of those not before this court to rescue him from the consequences of his own lack of qualification." *Id.* Again, the court's emphasis was on the fact that it had before it an individual claim made with respect to a particular promotion decision and that the relief sought was specific to that plaintiff alone.

*Melendez v. Illinois Bell Telephone Co.,* 79 F.3d 661 (7th Cir. 1996), is another case in which a single plaintiff asserted a disparate impact claim. In that instance, a standardized cognitive ability test was administered for entry into management. In its decision, the Seventh Circuit referenced its past decisions in *Carpenter* and *Gilty,* as well as the Supreme Court

decision in *Teal*, and concluded that a plaintiff lacked standing to sue under Title VII unless he could specifically claim that his injury was the direct result of the employment policy he was challenging. *Id*. at 667-68. In responding to the employer's argument that the plaintiff had first to show that he was qualified for the position he sought, the Court said:

> " ... this challenge raises concerns broader then the establishment of a prima facie case. In order for an individual plaintiff to have constitutional standing to bring a Title VII action, he must show that he was personally injured by the defendant's alleged discrimination and that his injury will likely be addressed by the requested relief."

*Id*. at 668.

In the end, the Seventh Circuit agreed with the district court's finding in *Melendez* that the plaintiff had presented extensive direct evidence that he was not hired because he had failed the BSAT test at issue and that he was otherwise qualified. *Id.* at 668-69. The Court determined that the employer's assertion that it would not have hired plaintiff in any event was a post-filing justification, considering that, after plaintiff had been interviewed, he was sent to take the test and, after being informed that he had not passed it, he was told he could retake the test in six months. *Id.* In its opinion, the court wrote: "Because plaintiff has sufficiently demonstrated that he was not hired due to his failure of the BSAT, we need not examine whether plaintiff was qualified for a management position." *Id*. Our reading of the case persuades us that this particular holding means that, where direct proof exists establishing that failure of the test at

issue caused a plaintiff to receive no further consideration for hiring or promotion, he has standing to sue.[4]

Whether examined from the standpoint of a "standing" issue or in terms of whether a prima facie case has been sufficiently established, Plaintiffs in the case at bar have proven that they were injured when they failed to pass a test which has been shown to have statistically discriminatory results and that they were thereby foreclosed from further consideration for promotions or transfers.  In the words of the Supreme Court in *Teal*:  "Title VII guarantees these individual respondents the *opportunity* to compete equally with white workers on the basis of job-related criteria."  *Teal*, 457 U.S. at 451 (emphasis in original).  Once their failing scores on the discriminatory test eliminated them from an opportunity to compete further, these Plaintiffs incurred a cognizable injury and thereby gained standing to sue in order to be compensated for that injury.  The statistical evidence of disparate impact contributes to their establishing the required prima facie showing.

---

[4]We view this conclusion as consistent with the holding in *Farrell v. Butler University*, 421 F.3d 609 (7th Cir. 2005), the most resent Seventh Circuit decision to address standing in a disparate impact case.  In *Farrell*, a female professor applied for a college-wide award which, if she had won it, would have increased her salary.  Though she met the qualifications to be considered for the award, she was not chosen.  In her legal challenge to her failure to receive the award, she argued that the criteria for winning the award had disparately impacted females.  *Id.* at 616.  The Seventh Circuit held that, because the plaintiff had met the qualifications and was in fact an actual candidate, she was not injured by the employment policy at issue and did not have standing to raise the issue of its alleged disparate impact upon other women.  *Id.* at 616-17.

Stated otherwise, all the Plaintiffs took the WCA in order to qualify for a promotion or transfer within Citizens Gas and failed the test, and thus were injured. This suffices to establish their prima facie case. Citizens has chosen not to rely on any defense of business necessity and therefore the analysis need go no further. Liability for disparate impact has been established, assuming the claims are timely, a subject we will address shortly.

Prevailing on the issue of liability, however, does not automatically entitle each Plaintiff to an award of compensatory damages. Compensatory damages are not, as a matter of law, available as a remedy in a disparate impact case. 42 U.S.C. § 1981a(a)(1); S. Rep. No. 101-315, at 55 (1990). To the extent they are entitled to equitable relief it could come in the form of an award of back pay. *In re Employment Discrimination Litigation,* 198 F.3d 1305, 1315 n. 13 (11th Cir. 1999). There is also the possibility that a particular prevailing Plaintiff may be equitably entitled to placement in a particular position within the gas division of Citizens. Such determinations will require separate inquiries by the court on a plaintiff-by-plaintiff basis. We reserve that undertaking to another day. For now, it is enough to know that a Plaintiff who failed the WCA and filed a timely claim is at a minimum entitled to a decree that neither his scores or the test may be used in the future.

## Disparate Treatment Claims

Each of the Plaintiffs here claims, in addition to being a victim of disparate impact discrimination, to be a victim of disparate treatment discrimination. They have asserted these claims under both Title VII and § 1981. None of the Plaintiffs has supported his individual disparate treatment claim with any direct evidence of discrimination, so, in hopes of prevailing,

-14-

each is proceeding under the indirect proof method explicated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  To be successful on a claim of discriminatory failure to promote, a plaintiff  must show that: (1) he is a member of a protected class; (2) he was qualified for and sought a promotion; (3) he was rejected for the promotion sought; and, (4) the position was not filled or was filled by a person who was not a member of the same protected class.  *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 833 (7th Cir. 2005).  Citizens concedes that all Plaintiffs in the case at bar are African-Americans and none received the promotion which he sought.  The remaining legal and factual disputes, therefore, center on whether elements two and four above have been established.

If a plaintiff successfully establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate non-discriminatory reason for not promoting the particular plaintiff.  *McDonnell Douglas*,  411 U.S. at 802.  If the employer successfully articulates such a reason, the burden shifts back to the plaintiff employee, who then must bring forth evidence tending to show that the employer's stated reason for its decision is a pretext for illegal discrimination.  *Id.* at 804.  If there is sufficient evidence of record to support a finding of pretext, the employee can avoid a summary judgment.

In their brief, Plaintiffs contend that they might also attempt to prove disparate treatment by showing that Citizens engaged in a pattern-and-practice of discrimination against all African-American employees.  However, as pointed out by Citizens, this passing remark represents Plaintiffs' first mention of such argument.  A "pattern-and-practice" theory was not raised in the EEOC charges, in the initial complaint or any of the amended complaints.  Nor was any mention

-15-

of a pattern-and-practice theory included in the Case Management Plan.[5]  Because no pattern-

and-practice claim was raised previously, Plaintiffs' attempt at this juncture to interject this as a

theory of relief is simply too late and the court, accordingly, shall not permit it to go forward.[6]

The allegations made by each Plaintiff in his respective charge is unique to each Plaintiff

and shall be addressed individually by the Court, *infra*.  However, certain portions of their claims

are common as to all the charges.   Those identical allegations provide as follows:

> At all times, Charging Party met Respondent's legitimate job performance
> expectations.  Respondent implemented a "base line test" as a prerequisite for
> certain job classifications, beginning in 1987.  Over the years, this base line test
> has been used in order to discriminate against African American employees in
> order to prevent them from obtaining promotions.  In addition, the test has a
> discriminatory impact upon African American employees, such as the Charging
> Party, and has resulted in African American employees being promoted at a lower
> rate than white employees of similar background and seniority.

---

[5]Litigants are required to delineate their legal theories to facilitate an understanding by the parties and the court on the particular dispute at bar in order to move the case forward to resolution in an efficient and fair manner.  The nature of the dispute and the schedule for resolving it are included in the Case Management Plan.  See L.R. 7.1.

[6] Even if we were to allow Plaintiffs to pursue a pattern-and-practice theory of recovery on their disparate treatment claims, they are, for all practical purposes,  left with only the discriminatory impact of the test and its continued use over many years by Citizens as evidence of such a pattern.  We view this evidence as better suited to proving the disparate impact claim.  "In order to prove that the employer has engaged in a pattern or practice of discrimination, then, the plaintiff must show that there is regular, purposeful, less-favorable treatment of a protected group."  *King v. General Elec. Co.*, 960 F.2d 617, 623 (7th Cir. 1992).  In any event, without significantly more than the three anecdotal examples they have cited referenced of individual perceived discrimination, Plaintiffs are far from meeting the threshold necessary to support a finding of a pattern of discrimination by Citizens against African-Americans.

> Respondent has used the base line test sporadically, requiring some African
> American employees to take the test, but not white employees, refusing to allow
> African Americans to take the base line test in other instances, and designing the
> tests in such a matter that it discriminatorily impacts African American
> employees.  Respondent has violated Charging Party's rights, and those of
> similarly situated employees, in violation of Title VII and 42 U.S.C. § 1981, as
> well as other laws outside the jurisdiction of this agency.

The charge language refers to "base line" testing that began in 1987.  However, the

specific test taken by each Plaintiff at issue here was what we refer to as the WCA.  In 1999,

Citizens began using the WCA.  It was developed by Dr. Roland Guay and consisted of 120

questions which were a consolidation of a larger, more extensive battery of tests.  These earlier,

more extensive tests were referred to at Citizens as "baseline tests" and were intended to

measure a person's aptitude for particular types of jobs.  Their purpose in shifting to the more

consolidated WCA, according to Citizens, was to improve their ability to determine a person's

aptitude for taking on new responsibilities.  The WCA was not tailored to any particular job, but

instead purported to measure general employability characteristics.  Though we refer to this

newer, consolidated test as the WCA, we acknowledge that the record reflects that certain parties

and witnesses continue to use the more generic term of  "baseline test" when referring to any of

the tests that were given by Citizens.

When Citizens employed the WCA, it did so more extensively than any single prior test

so that its use over time came to include initial applicants for employment.  From the start, the

WCA was used to pre-qualify applicants for transfers or promotions between divisions.  It was

also used in connection with transfers or promotions within bargaining units as well as several

non-bargaining units positions.  Various minimum scores were required to qualify for various

types of positions (*see* footnote #1).  Both Dr. Guay and Citizens regarded the WCA as an efficient, lower cost alternative to past groups of tests because it was easier to administer or grade.  Dr. Guay graded the tests taken by employees and reported back the results to Citizens. The test was given at least quarterly, and the names of those persons who passed went on lists, making them eligible for openings existing at the time or which would arise in the future.  A person could take or retake the test, without regard to whether an opening for a particular job actually existed at the time.  Similarly, a person could bid for a posted job without having passed the test, but, without passing the WCA prior to the time the sought-after job was filled, the applicant would not be considered for that job.  Other factors, such as an applicant's disciplinary record and, importantly, his seniority were considered in filling a given position.  Employees were free to sign-up for posted jobs, and, if eventually offered a position, they were still free to turn it down.

Dr. Guay determined the scores necessary to pass the test.  At all relevant times, he assured Citizens that his test was vocationally valid and would hold up to any legal challenge. The WCA was created as an outgrowth of testing Dr.Guay had done for another of his clients, Caterpillar Corporation, and he represented to Citizens that he had validated the use of the tests in connection with Caterpillar.   Citizens never asked for nor received any separate validation studies or reports.  Because the test had become an issue during the process of collective bargaining, certain union officials had attended meetings during which Dr. Guay explained the test's use and validity, prompting them on at least one occasion to confront Citizens with their concerns over the potentially discriminatory nature of the test.  Another meeting at which Dr. Guay addressed company and union officials included a comment by union representatives that

-18-

white males comprised 12 of the most recent 13 new hires and an inquiry as to the reason for that

result.  Dr. Guay's specific response was not communicated to us, but testimony from one of the

union officials indicates that both the union and company representatives who attended that

meeting apparently were satisfied with Dr. Guay's explanation as to the validity of the test

results.  However, in March of 2004, it appears that Dr. Guay, himself, had lost confidence in the

test because at that time he advised Citizens that the test should no longer be used and stated that

he would no longer score the test.  Accordingly, Citizens discontinued its use of the WCA and

has not replaced it since with any other test.  Citizens advises that it has no current intention of

substituting any new form of test.

On these facts, based on the common allegations relating to all the Plaintiffs, two

separate claims, which we refer to in this discussion as their general disparate treatment charges,

are being asserted by them jointly; as to both, we find no basis in the evidence that permits them

to go forward.  In addition, most of the Plaintiffs claim that the denial of transfers to specific jobs

also amounted to individualized disparate treatment.  Following our discussion of the two

general claims, we will address the more individualized claims which, we have determined, can

also be analyzed and disposed of as a group.

First, there is an allegation[7] that Citizens relied on the test on a sporadic basis, at times

requiring African Americans to take the test but not white employees.  If true, this would clearly

constitute actionable adverse action against these Plaintiffs.  However, there is a complete lack

of evidence in the record to support this allegation.  In fact, the only evidence brought to our

_____

[7]This claim appears both in the EEOC charges and in the third amended complaint.

-19-

attention addressing this issue is the deposition testimony of six of the Plaintiffs to the effect that they were not aware of any instance when, in terms of who was required to take the WCA in order to qualify for transfer or promotion, a distinction was made based upon race or ethnicity. The evidence establishes that every employee seeking to be transferred to a position in another division of Citizens for which the test was required was required to take the test, without regard to the race of the individual employee.  Consequently, with regard to Plaintiffs' claim of disparate treatment based on their allegedly being required to take the test when Caucasians or others were not, Citizens is entitled to summary judgment.

Plaintiffs' next general disparate treatment claim is based on their allegation that Citizens utilized the test with the intent to discriminate against African Americans; as such, it is a more straightforward claim.  Once again, however, there is no direct evidence to support any such intent on the part of Citizens.  Plaintiffs argue that Citizens's near total reliance on Dr. Guay regarding the test's validity and its purported absence of discriminatory impact constituted the type of willful "head in the sand" ignorance that the Seventh Circuit has construed as intentional discrimination.  In support of this argument, Plaintiffs cite *E.E.O.C. v. Indiana Bell Telephone Co., Inc.*, 214 F.3d 813, 821 (7th Cir. 2000)(opinion vacated) and *Jonasson v. Lutheran Child and Family Svcs.*, 115 F.3d 436, 438 (7th Cir. 1997).  Quite apart from Plaintiffs' questionable strategy of relying on a decision which was subsequently vacated, both of these cases are largely irrelevant because they each deal with an employer who ignored workplace sexual harassment of

which it was aware.  Neither case deals with the type of disparate treatment which Plaintiffs have alleged here.

Unlike the two employers in those two cited cases who were apparently inundated with reports of inappropriate sex-based behavior by the harassing employee,  the record in the case at bar does not reveal that Citizens ever received much, if any, negative feedback - never mind actual complaints - regarding the use of the test.  When a manager or union official did raise a question regarding the test, Citizens contacted Dr. Guay and, on at least two occasions, after he came to the workplace to make in-person explanations of the test, its function and validity, the concerns were quelled.

There is no question that Citizens relied heavily on the expertise and advocacy of Dr. Guay in terms of its use and validity assumptions regarding the WCA.  But substantial reliance on an expert who provides guidance to the employer, especially when that professional had served as a consultant since 1979, does not create an inference of intentional discrimination. Here, the evidence is clear that Citizens used what it believed to be a legitimate selection test to help identify the most qualified persons to fill certain positions.  While Citizens may have been misguided or imprudent in placing such substantial reliance on Dr. Guay given the obvious economic stake he had in defending his "product" and "line of business," which reliance increased Citizen's exposure to any well founded claim of disparate impact should Dr. Guay's advice prove faulty, no evidence exists to establish that the test used by Citizens was utilized by it for the purpose of discriminating against any particular group of employees.  Plaintiffs' allegation that Citizens caused Dr. Guay to design a test that would intentionally discriminate is

simply unsupported by any evidence.  Further, the statistical disparities in results between groups

of test-takers was not so obvious as to prompt Citizens to question the expert assurances it was

receiving from Dr. Guay.

Plaintiffs' inability to establish a discriminatory intent on the part of Citizens defeats

their individualized claims of disparate treatment as well, because their individualized claims are

based on Citizens's refusal to place them in particular jobs, which  amounts to intentional

discrimination.  Even if we assume that each Plaintiff met his obligation under *McDonnell*

*Douglas* to show that he was qualified for a particular position and that the position was filled by

a non-African American – an assumption Citizens vigorously challenges –  the company has

asserted without rebuttal by Plaintiffs both the lack of other qualifications and the facially

neutral WCA results as the reasons for its decisions not to promote or transfer each Plaintiff.

Without some evidence of an underlying discriminatory purpose in administering the test or in

relying on Dr. Guay's expert assurances as to its usefulness and validity, pretext has not been

established.  Accordingly, summary judgment on all of the Plaintiffs' disparate treatment claims

must enter in favor of Citizens.[8]

**Timeliness**

Before we move on to examine the specific disparate impact claims of each individual

Plaintiff, we must address and resolve the issue of the applicable statute of limitations periods.

Since all that remains at this point are Plaintiffs' disparate impact claims, we need not worry

---

[8]Plaintiff Thompson has a claim for disparate treatment which is discussed *infra* and, as we explain there, at least for now, remains viable.

about whether a two or four year limitations period would be applicable under 42 U.S.C. § 1981. Regarding Title VII claims, a charge of discrimination must be filed with the EEOC within 300 days of the alleged discriminatory act and any lawsuit must be filed within 90 days following the receipt of  right to sue letters from the EEOC.  *National R.R. Passenger Corp. v. Morgan,* 536, U.S. 101, 109-110 (2002).  Plaintiffs clearly filed their lawsuit within the 90-day time period following notification from the EEOC.  Since only discriminatory acts which occurred within 300 days before the date the EEOC charge was filed are actionable, the only time limitations question currently at issue is with respect to whether the discrimination complained of by each Plaintiff occurred within 300 days prior to his filing his charge with the agency.

We wish this straightforward analysis of the issue would yield to as simple and straightforward an answer.  Unfortunately, the parties are at odds with each other on various predicate matters bearing on the ultimate resolution of the question of the timeliness of Plaintiffs' claims.  Much of the conflict between them centers on identifying the discreet discriminatory acts that actually occurred, and, when they occurred.  Plaintiffs contend that the giving of the inherently discriminatory test was the triggering act in terms of the limitations period, while Citizens references the denial of a particular job bid as the benchmark from which to measure the timeliness.  Our analysis brings us to the conclusion that both are partially correct and partially incorrect.

The emphasis on identifying "discreet acts of discrimination" arises from the Supreme Court's decision in *National R.R. Passenger Corporation v. Morgan,* 536 U.S. 101 (2002), in which the Court ruled that related acts of discrimination which do not amount to a continuing or

ongoing violation do not support the bringing of a claim for those initial discriminatory acts which preceded the 300 day period for filing a charge.  The Court emphasized that Title VII expressly references specific  "discreet acts" or "occurrences" as the basis of prohibited discrimination.  *Id.* at 111; 42 U.S.C. § 2000e-2.   In effect, the *Morgan* decision permits the continuing violation doctrine to apply only to remediate hostile work environment or pattern-and-practice claims.  *See Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 270 (7th Cir. 2004).  Otherwise, a plaintiff is precluded from recovery for an injury resulting from a discriminatory act occurring prior to the 300-day time period.  *Id.*

We view the injury incurred by a Plaintiff in the case at bar to have arisen at the point when his failure of the test prevented him from being considered for promotion on the same basis as those who passed the test, which is to say, the point in time after the test was scored and the Plaintiff was notified of his failing grade.  Computed from the date of that notice, a Plaintiff had 300 days within which to file his EEOC charge to seek a remedy for his discrimination under Title VII.  The notification to him of his failed test result constituted the "discreet act,"  as the term is used in *Morgan,* which had a disparate impact upon him.  That said, we also hold that, when a Plaintiff was denied a specific job that he was otherwise qualified for but for his test score, an alternative 300-day time period starts to run based on the "discreet act" of Citizens's reliance upon the WCA score in denying him that position.  While we have found that such a denial was not intentional discrimination, it too had a distinct unintentional discriminatory impact upon a Plaintiff.

-24-

Clearly, the types of remedy arising from these two kinds of claims may differ. For example, the denial of the right to compete fairly may warrant an injunction or remedial decree prohibiting the use of the WCA test scores in order to redress the harm to potential applicants. Whereas, if a Plaintiff can show that he did not apply for a position because of his failing score and he would have been otherwise eligible for that promotion, he may be entitled to some more specific and individualized form of equitable relief. Similarly, the denial of a specific promotion or transfer which a Plaintiff actually applied for and would otherwise have qualified for but for his test results could position that Plaintiff to receive an award of back pay and/or placement in the next available similar position. The statute gives the Court broad discretion in assessing whether equitable relief is appropriate and, if so, what form it should take. Accordingly, we examine below each Plaintiff's individual claims in an effort to identify whether the agency charge was timely filed, and whether his claim under Title VII survives.

### *Plaintiff Todd Davidson*

On July 1, 2002, Todd Davidson filed his charge of discrimination with the EEOC. The allegations contained in the charge unique to him provide as follows:

> Charging Party is employed in the manufacturing department as an industrial electrician for Respondent. Charging Party has been employed by respondent for 23 years.

> Charging Party took the base line test and applied for a promotion in August of 2001. He was notified on September 11, 2001, that he did not get the promotion. He subsequently found out that the position was filled by a white employee with less seniority.

Applying our timeliness analysis as explicated above, the September 11, 2001,[9] notification to Davidson that he would not receive the position he had bid on because of his failing score on the WCA places his disparate impact claim clearly within the applicable 300-day time period preceding his filing of his EEOC claim on July 1, 2002.  Thus, Mr. Davidson's claim was timely.  Whether he (or any of the other Plaintiffs, for that matter) was otherwise qualified for any particular position shall be determined separately, when we examine the relief to which he is entitled.  We note that the record reflects that Mr. Davidson did bid for positions subsequent to taking and failing the test and was denied those jobs as well.

*Plaintiff Wilbert Wiggins*

Wilbert Wiggins filed his charge with the EEOC on September 5, 2002.  His charge contains the same general allegations of disparate treatment as were filed by his co-Plaintiffs.  His charge also asserts specific disparate treatment with regard to restrictions which Citizens put on his activities as a janitor; however, Mr. Wiggins has chosen not to pursue that claim in this litigation.  The allegations contained in the charge with regard to the WCA unique to him provide as follows:

> Charging Party was employed in the manufacturing department as a Boiler Room Operator for Respondent.  Charging Party was an employee of Respondent from March 8, 1985 to the present.

> Charging Party took the base line test and applied for a promotion on March 28, 2002.  He was notified thereafter that he did not get the promotion.  He subsequently found out that the position was filled by a white employee with less seniority.

---

[9]We can not help but note in passing the coincidence of this event with the fateful and tragic events unfolding elsewhere.

-26-

Citizens asserts that Wiggins most recently took the WCA on December 28, 2001, which date would make his September 5, 2002 claim of disparate impact in his EEOC charge timely, at least with respect to the injury associated with the testing requirement itself.  However, Mr. Wiggins has included no argument or claim with respect to any particular job he alleges to have been denied in 2002, claiming only that he was denied positions in 2000 and February of 2001, which, of course, would not be timely.

Plaintiffs contend that the "piggy-back" or "single-filing" rule applies here, which would allow any individual Plaintiff who did not file a charge within 300-days of a specific job denial to benefit from the filing of a charge by another employee with respect to his denial of the same position.  The "piggy-back" rule references a court-made exception to the requirement that an individual claimant must timely exhaust his administrative remedies before being allowed to file suit.  *See Horton v. Jackson County Bd. of County Com'rs.*, 343 F.3d 897, 899 (7th Cir. 2003). This exception is based on the theory that, if the claim implicates the same conduct complained of by one person who did raise the alleged discrimination in his charge, that should suffice as to all such potential claimants because the purpose of the charge-filing requirement - namely, to provide an opportunity for the agency to facilitate a resolution - has been satisfied.  *Id*.  Plaintiffs maintain that especially in a disparate impact case such as this, that rule is appropriate.

We are prepared to apply that exception to the general rule with respect to claims arising out of the test requirement itself, since there the claim and the remedy are one and the same.  All employees seeking inter-division transfers who were made to take a test which disproportionately favored non-African Americans suffered the same wrong and, clearly, the best

-27-

remedy to that wrong would be to enjoin the employer from relying on the test for selection purposes in the future.  Additionally, where a single Plaintiff continues to have his job bids denied because of the effect of his test score(s), so long as he filed a charge complaining of the employer's reliance on the test in connection with a job denial, no legitimate purpose would be served by requiring that person to file additional charges with each successive denial.  However, where multiple Plaintiffs are claiming to be qualified for and entitled to the same position, a need arises for each individual to assert that specific claim in order to permit a resolution to be reached at the agency level, if possible.  Consequently, it is our judgment that the "piggy-back" rule does not apply to a claim by an individual Plaintiff, like Wiggins, who was denied transfer or promotion to a job more than 300 days prior to his filing a charge with the EEOC.  Thus, we hold that Mr. Wiggins's claim is limited to obtaining a remedy which would prohibit Citizen's further reliance upon the WCA or its results, but nothing more particularized to him.

### *Plaintiff George Douglas, Jr.*

On August 21, 2002, George Douglas, Jr. filed his charge of discrimination with the EEOC.  The allegations contained in the charge unique to him provide as follows:

> Charging Party was employed in the manufacturing department as a Mason A-rate for Respondent.  Charging Party has been an employee of Respondent from October 7, 1981 to the present.

> Charging Party took the base line test and applied for promotions routinely during his employment with the Respondent, including August 28, 2001 and March 22, 2002.  He was notified each time that he did not get the promotions.  He subsequently found out that white employees with less seniority filled the positions.

> On June 27, 2002, the Charging Party once again took the base line test.  On July 17, 2002, the Respondent informed him that he passed the base line test.  The

Respondent immediately placed the Charging Party on suspension without pay, so that an investigation would be conducted to determine if the Charging Party had cheated on the base line test.  White employees have not been placed on suspension, nor investigated for cheating when they have passed the base line test.

The Third Amended Complaint and the discussion in the briefs supporting these motions for summary judgment make clear that Douglas has not pursued a disparate treatment claim with respect to Citizens's challenge to his passing score.  However, Citizens has acknowledged that he took the WCA within 300 days prior to filing his EEOC charge, making his disparate impact claim timely with respect to the test requirement and with respect to any denial of a job solely because of his test score, assuming the denial also occurred within the 300-day period.  Thus, Douglas's disparate impact claim survives the motion for summary judgment, but like the others he has no surviving disparate treatment claim.

### *Plaintiff Charles Magee*

Charles Magee filed his charge with the EEOC on August 27, 2002.  The unique allegations in his charge provide as follows:

Charging Party has been an employee of Respondent from June 3, 1987 to the present.

Charging Party took the base line test and applied for promotions approximately every three (3) months during his employment with the Respondent.  He was notified each time thereafter that he did not get the promotions.  He subsequently found out that white employees with less seniority filled most of the positions.

On June 28, 2002, the Charging Party once again took the base line test.  On July 17, 2002, the Respondent informed him that he passed the base line test.  The Respondent immediately placed the Charging Party on suspension without pay, so that an investigation could be conducted to determine if the Charging Party had cheated on the base line test.  White employees have not been placed on suspension, nor investigated for cheating, when they have passed the base line

test.

As was true with Plaintiff Douglas, Mr. Magee has also chosen not to pursue a claim of disparate treatment regarding the alleged cheating incident.  Citizens admits that Magee took the WCA on December 28, 2001, clearly within the 300-day pre-filing time frame, making his disparate impact claim timely as to the discriminatory testing in December 2001 and any succeeding tests he may have taken and not passed.  In addition, any part of his claim which is based on being denied a position solely because of the score he received on any of the tests after the 300 day cut-off is also timely and survives summary judgment.

### *Plaintiff Daron Thompson*

Paragraph 26 of the Third Amended Complaint asserts:  "Daron Thompson passed the test and obtained a transfer, but was paid less then his white co-workers holding the same job."  Despite this allegation, Thompson filed a charge of discrimination with the EEOC complaining that he took the WCA, was denied a position and found out that a white employee with less seniority was given the position.  Thompson's charge was filed with the agency on July 16, 2002 and Citizens admits he had taken the WCA on June 27, 2002.  Assuming the accuracy of the WCA score summaries prepared and submitted by counsel for Plaintiffs, Thompson appears to have failed the June 27, 2002 test.

What Mr. Thompson is specifically claiming in this lawsuit is confusing at best and the briefing by counsel has not helped to clarify his theory of relief.  Citizens seeks summary judgment as to all of Thompson's claims, yet fails to address the allegation in the Third Amended Complaint that Thompson was paid less than white co-workers holding the same

-30-

position as he.  Instead, Citizens focused on the fact that the WCA was not required for the jobs within the manufacturing division that Thompson had bid on and that he became an employee of Citizens in its manufacturing division after June of 1987 and therefore did not qualify for transfer to a job in another division.

Plaintiffs counter, citing an instance of a white employee in manufacturing with less seniority than Thompson who was allowed to transfer to the gas division and relying on a deposition excerpt which we could not locate by the referenced exhibit number.  Thompson seems to concede that he may not have had the ability to compete with others at Citizens for a gas division position, but maintains that he should at least have had the same opportunity to fill positions in the gas division as were filled by applicants off the street.  According to Thompson, his test scores prevented that, but no mention is made in the supporting brief of his claim in the Third Amended Complaint that he was placed in a new position but paid less than others.

There is some evidence that Thompson took the WCA and failed.  Unless his taking of the test was a mistake, which, as we understand it, is not  Citizens's defense here, he has a disparate impact claim.  Based solely on the allegations of the Third Amended Complaint and the failure of Citizens to address those allegations, Thompson's disparate treatment claim with respect to unequal pay also survives Defendant's summary judgment motion, at least for now.

*Plaintiff Eugene Smith*

On August 28, 2002, Eugene Smith filed his charge of discrimination with the EEOC. The allegations contained in the charge unique to him provide as follows:

> Charging Party was employed in the manufacturing department as a By-Product Operator for Respondent.  Charging Party has been an employee of Respondent from September 17, 1979 to the present.

> Charging Party took the base line test and applied for a promotion on June 27, 2002.  He was notified thereafter that he did not get the promotion.  He subsequently found out that the position was filled by a white employee with less seniority.

There is no apparent dispute that Eugene Smith took the WCA in June of 2002, which means that he had taken the test within 300 days prior to the August filing of his charge.  In addition, he bid for a position in the gas division subsequent to taking the test in June of 2002 and did not receive it.  As it has argued in other instances, Citizens maintains that Smith would not have received the job he had bid on regardless of his score.  While that may be true, such a fact goes only to the possibility of back-pay, which is not an issue we are reaching today in this ruling.  Smith's claim therefore shall proceed.

*Plaintiff George Rodgers*

George Rodgers works as a mason in the manufacturing division and has been a Citizens employee since July of 1981.  He took the WCA in April of 2002.  He filed his charge of discrimination with the EEOC in August of that same year.  He, too, sought, but was denied, a position in the gas division subsequent to taking the test.  His claim is timely, thereby potentially

entitling him to some form of relief beyond injunctive relief, depending on the individualized proof he is able to adduce.

### Plaintiff Kenton Smith

Kenton Smith filed his EEOC charge on August 27, 2002. He asserts that he took the WCA on December 28, 2001. Like certain other Plaintiffs, he also works in the manufacturing division. Subsequent to taking the test, he had applied for one position at the gas division and was turned down. He also claims that he did not apply for other positions because he thought it useless in light of his test score. We find, on the basis of these showings, that Kenton Smith's disparate impact claim is timely; whether he can establish an entitlement to some form of equitable relief beyond an injunction, however, must also await another day.

## Business Necessity and Available Remedies

Citizens has not sought to establish that, despite the differentiated pass rates between Caucasians and African Americans, the WCA was administered in response to a valid business necessity. To establish business necessity, Citizens would need to have shown that the test measured criteria that had a demonstrable relationship to successful performance of a specific type of job. *Bew v. City of Chicago,* 252 F.3d 891, 894-95 (7th Cir. 2001). Absent such proof, an inference of discrimination arises as a result of the test scores exceeding the "four-fifths" rule, *see* 29 CFR § 1607.4(D), and, on that basis, the Court finds that Citizens has violated the disparate impact provisions of Title VII with respect to each of the eight (remaining) Plaintiffs.

What remedies flow from these determinations as to each Plaintiff is a more complex

-33-

matter, but it is at this point where Plaintiffs' claims begin to lose some of their momentum. While we do not reach the issue of "damages"[10] today, it is clear that Citizens's rebuttal evidence is highly compelling with respect to each of the individual claims of damages, especially when compared to that available to it in attempting to fend off a finding of liability. We think it might be helpful to the parties, therefore, for the Court to explicate here our intended methodology for resolving each Plaintiff's entitlement to relief.[11] As discussed previously, if the only injury proven by an individual Plaintiff is the denial of the chance for him to compete fairly with others for particular positions, his remedy would likely be limited to a non-monetary recovery, because, we repeat, compensatory and punitive damages are only available where intentional discrimination is present. Only if a Plaintiff is able to prove that "but for" his failing score on the WCA, he would have received a specific position in the gas division, would he be entitled to something more than an order ensuring that in the future he will compete on a level playing field.

---

[10] "Damages" may not be the most appropriate term here in light of the fact that any entitlement to a remedy would be purely equitable. One equitable remedy being sought and which may be available here upon a proper showing is back pay; because back pay usually means "money", we tend to express that loosely as "damages." For a good discussion of the "damages" or "available relief" issue as it pertains to individual disparate impact claims, *see* 2 Arthur Larson, *Employment Discrimination*, ch. 31 § 31.02 (2nd ed. 2006). This topic is also discussed extensively in *In re Employment Discrimination Litigation,* 198 F.3d 1305, 1315 n. 13 (11th Cir. 1999).

[11] Any trial in this cause will be to the Court. A jury trial is only available when a Title VII plaintiff is pursuing a claim of intentional discrimination. 42 U.S.C. § 1981a(c). Though we have allowed Daron Thompson's disparate treatment claim for unequal pay to survive, we have done so primarily because of the silence of both parties concerning the allegations in the Third Amended Complaint. Should this claim be further developed through additional motions practice, it may also yield to a summary ruling. However, should there be disputed material facts with respect to the claim, it would likely be severed from the remaining claims, thus allowing Mr. Thompson to pursue his right to a trial on that issue.

If an individual Plaintiff establishes that he should have received a certain position in the gas division, the court may conclude that he is entitled to be placed in that position and/or to receive back-pay accruing during the intervening period of time.  Another remedial option might be to assign an eligible Plaintiff priority standing with regard to the next available position in the gas division.  However, unless a Plaintiff can establish that he was prevented from working in the gas division by virtue of his test score or scores, his remedy will, in all likelihood, be limited to an order enjoining Citizens from any future discriminatory action against him based on his WCA scores.

One additional "damages" issue deserves mention here as well: we have ruled that Plaintiffs have prevailed on their disparate impact claim and, as prevailing parties, they are entitled to have Citizens pay their reasonable attorneys fees.  *See* 42 U.S.C. § 2000e-5(k).  "The degree of a party's success can bear on the propriety of the amount of the fee award."  *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 865 (7th Cir. 2001).  Whatever relief a plaintiff secures must directly benefit him at the time of judgment to permit him to recover attorney fees as a prevailing party.  *Farrar v. Hobby,* 506 U.S. 103, 111 (1992).  In the context of this litigation, the term "reasonable" takes on a special significance, because, as was made clear from our prior rulings, we have declared that the manner in which this case was initially prosecuted by Plaintiffs' counsel was far less than a model of efficiency and effective litigation management.  Therefore, we provide this advance notice that any petition for attorney fees by Plaintiffs will be examined in light of the history of the case and the final outcome to assure that any award of fees is

reasonable and reflective of the work that was <u>necessary</u> to secure the benefits obtained by any individual Plaintiff.

### *Summary of Court Rulings*

Each Plaintiff is entitled to summary judgment with respect to his claim of liability against Citizens for disparate impact discrimination; therefore, Plaintiffs' Motion for Partial Summary Judgment (**Document #346**) is **<u>GRANTED</u>**.  Citizens is entitled to summary judgment on all claims of Sidney Williams and Jimothy Amos and the claims of all Plaintiffs based on disparate treatment, with the exception of the claim of unequal pay asserted by Daron Thompson; therefore, Defendant's Motion for Summary Judgment (**Document #352**) is **<u>GRANTED IN PART</u>**.

A bench trial of the particular disparate impact claims of each remaining Plaintiff shall be scheduled after the parties and their counsel have had an opportunity to discuss the rulings made herein, preferably facilitated by the Magistrate Judge.  Accordingly, counsel for both sides are directed to confer forthwith and provide to the Magistrate Judge at least three mutually agreeable dates during January or February, 2007, when such a conference can be conducted.

**IT IS SO ORDERED**  01/18/2007


_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana


Copies to:

-36-

Wayne O. Adams III
ICE MILLER LLP
wayne.adams@icemiller.com

Robert David Eaglesfield III
PRICE WAICUKAUSKI & RILEY
deaglesfield@price-law.com

Curtis W. McCauley
ICE MILLER LLP
mccauley@icemiller.com

Henry J. Price
PRICE WAICUKAUSKI & RILEY
hprice@price-law.com

William N. Riley
PRICE WAICUKAUSKI & RILEY
wriley@price-law.com

Ronald J. Waicukauski
PRICE WAICUKAUSKI & RILEY
rwaicukauski@price-law.com