## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| **WILBERT WIGGINS, GEORGE DOUGLAS, JR., CHARLES MAGEE, GEORGE RODGERS and KENTON SMITH** | ) ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | |
| **CITIZENS GAS & COKE UTILITY,** | ) | **1:03-CV-1882-SEB-JMS** |
| **Defendant.** | ) ) ) ) ) | |

## <u>ENTRY & ORDER ON BENCH TRIAL</u>

This matter is before the Court following a bench trial which began on November 26, 2007, and continued through November 28, 2007.  The conclusion of the trial was delayed due to the reopening of bankruptcy proceedings involving two former Plaintiffs.  Prior to trial, the claims of two of the Plaintiffs, Todd Davidson and Eugene Smith, were bifurcated after the Court determined that their respective bankruptcy estates were the real parties in interest, which determination required notice to the trustees and additional proceedings in the bankruptcy court.  Thereafter, the bankruptcy trustees of the Davidson and Smith estates reached settlements of their claims in this litigation, removing their claims from further consideration by the Court.  We

-1-

turn now to resolve the merits of the as yet unresolved claims of the remaining Plaintiffs.

### *Procedural Background*

This case was brought by a group of African-American employees of the Defendant, Citizens Gas & Coke Utility ("Citizens"), and two African-American job applicants who were denied employment with Citizens.  Together they claimed that they were denied employment, promotions or transfers as a result of an inherently discriminatory screening test[1] (the "WCA"), which was utilized by Citizens for a period of time to inform management's decisions as to which applicants should be hired and which employees were eligible to receive promotions or transfers to certain divisions.  Plaintiffs initially sought certification as a class of similarly situated employees/applicants who had suffered injury, based on disparate impact and disparate treatment theories of liability.

We denied class certification, finding that the two "applicant" Plaintiffs did not adequately represent the proposed class and that there were significant differences among the interests of the individuals who would have comprised the proposed class.  In addition, we held that common issues did not

---

[1]There were two versions of the screening test used by Citizens:  The first was referred to as the "Baseline Test" and the latter was dubbed the "Work Competency Assessment."  Though the tests were quite similar, our finding of discriminatory impact, based upon statistical analysis, was with regard  to the latter test, which we have referred to as the WCA.

predominate among all Plaintiffs.  These class-based deficiencies were compounded by the adversarial inadequacies of Plaintiffs' then-counsel who in addition to the class certification also sought designation as class counsel.

After denying class certification, the Court, in an entry dated January 18, 2007[2], ruled that Citizens was entitled to summary judgment on all the claims by the two "applicant" plaintiffs as well as the disparate treatment claims of all other Plaintiffs.[3]  However, the remaining Plaintiffs prevailed on liability as to their disparate impact claim, based on the incontrovertible statistical evidence of disproportionality.  Because a prevailing plaintiff on a disparate impact claim is entitled only to an award of equitable relief, rather than money damages, the Court entered an injunction against Citizens's use of the WCA as well as any and all reliance on Plaintiffs' performance scores on the test.[4]  Recognizing that an individual Plaintiff might be entitled to other equitable remedies, such as back pay or placement into a specific job position if that Plaintiff could show that, but for his lack of success in passing the WCA,

---

[2]Our entry of January 18, 2007, provides a  detailed factual and legal analysis with regard to claims that did not survive summary judgment, including background information regarding the organizational structure and labor workforce at Citizens.

[3]A claim of disparate impact in the form of unequal pay survived summary judgment only with respect to Plaintiff Daron Thompson.  Mr. Thompson's claims were subsequently settled and have now been dismissed from this action.

[4]Citizens agreed prior to this litigation that it would cease using or administering the WCA as a screening device.  Nonetheless, the Court has determined that Plaintiffs are entitled to a court ordered injunction against the future use of such information.

he would have received such a transfer or promotion, the Court permitted evidence to be introduced at trial that might tend to support such an entitlement.

Resolution of the issues before us has been substantially complicated by the need to determine the timeliness of the filing of each Plaintiff's charge with the Equal Employment Opportunity Commission.  To succeed, a Title VII claim brought in federal court must be preceded by the filing of a charge of discrimination with the  EEOC or an authorized state agency within 300 days of the alleged discriminatory act.  *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109-110 (2002).  The purpose of this filing requirement is twofold:  to notify the employer of the discriminatory allegation and to give the EEOC an opportunity to remedy the alleged unlawful conduct through informal conciliation.  *Doe v. Oberweis Dairy*, 456 F.3d 704, 708-09 (7th Cir. 2006). Each of the Plaintiffs here filed a charge of discrimination which alleged that the WCA was discriminatory and that each had been denied transfers or promotions to posted job openings at the gas division of Citizens because of failing scores on the WCA.  However, these individual charges were filed with the EEOC over the course of several months, each indicating that an individual Plaintiff had taken the WCA at a certain time and each had applied for one or more of the available job postings.

We previously addressed the issue of the timeliness of Plaintiffs' filings in

resolving the summary judgment motions.  Plaintiffs had argued that, because

the WCA was the root cause of the harm and the requirement that it be taken

was common to all Plaintiffs, a "single-filing" or "piggy-back" rule should apply

which would allow Plaintiff Todd Davidson's timely charge[5] to serve as the

predicate notice applicable to all Plaintiffs including him, regardless of when

each of the other Plaintiffs actually took the test or was denied a particular

transfer to the gas division.  We draw again on our extensive analysis in that

ruling to explain the events that led up to the trial.

> … Unfortunately, the parties are at odds with each other on
> various predicate matters bearing on the ultimate resolution of the
> question of the timeliness of Plaintiffs' claims.  Much of the conflict
> between them centers on identifying the discreet discriminatory
> acts that actually occurred, and, when they occurred.  Plaintiffs
> contend that the giving of the inherently discriminatory test was
> the triggering act in terms of the limitations period, while Citizens
> references the denial of a particular job bid as the benchmark from
> which to measure the timeliness.  Our analysis brings us to the
> conclusion that both are partially correct and partially incorrect.

> The emphasis on identifying "discreet acts of discrimination"
> arises from the Supreme Court's decision in *National R.R.
> Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), in which
> the Court ruled that related acts of discrimination which do not
> amount to a continuing or ongoing violation do not support the
> bringing of a claim for those initial discriminatory acts which
> preceded the 300 day period for filing a charge.  The Court
> emphasized that Title VII expressly references specific "discreet
> acts" or "occurrences" as the basis of prohibited discrimination.
> *Id.* at 111; 42 U.S.C. § 2000e-2.  In effect, the *Morgan* decision
> permits the continuing violation doctrine to apply only to remediate
> hostile work environment or pattern and- practice claims.  *See
> Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 270 (7th Cir.

---

[5]Todd Davidson was the first to file a charge of discrimination challenging the WCA on
behalf of himself and others similarly situated.  His charge was filed on July 1, 2002.

2004).  Otherwise, a plaintiff is precluded from recovery for an injury resulting from a discriminatory act occurring prior to the 300-day time period.  *Id.*

We view the injury incurred by a Plaintiff in the case at bar to have arisen at the point when his failure of the test prevented him from being considered for promotion on the same basis as those who passed the test, which is to say, the point in time after the test was scored and the Plaintiff was notified of his failing grade. Computed from the date of that notice, a Plaintiff had 300 days within which to file his EEOC charge to seek a remedy for his discrimination under Title VII. The notification to him of his failed test result constituted the "discreet act," as the term is used in *Morgan*, which had a disparate impact upon him.  That said, we also hold that, when a Plaintiff was denied a specific job that he was otherwise qualified for but for his test score, an alternative 300-day time period starts to run based on the "discreet act" of Citizens's reliance upon the WCA score in denying him that position.  While we have found that such a denial was not intentional discrimination, it too had a distinct unintentional discriminatory impact upon a Plaintiff.

Clearly, the types of remedy arising from these two kinds of claims may differ.  For example, the denial of the right to compete fairly may warrant an injunction or remedial decree prohibiting the use of the WCA test scores in order to redress the harm to potential applicants.  Whereas, if a Plaintiff can show that he did not apply for a position because of his failing score and he would have been otherwise eligible for that promotion, he may be entitled to some more specific and individualized form of equitable relief.  Similarly, the denial of a specific promotion or transfer which a Plaintiff actually applied for and would otherwise have qualified for but for his test results could position that Plaintiff to receive an award of back pay and/or placement in the next available similar position. The statute gives the Court broad discretion in assessing whether equitable relief is appropriate and, if so, what form it should take.

*Entry on Cross Motions for Summary Judgment,* January 18, 2007 (Doc. #388),

p. 23-25.

We applied this analysis in the summary judgment context in determining

the timeliness of each individual Plaintiff's claims.   We again excerpt the

portion of our discussion addressing the "single-filing" rule:

>     Plaintiffs contend that the "piggy-back" or "single-filing" rule
> applies here, which would allow any individual Plaintiff who did
> not file a charge within 300-days of a specific job denial to benefit
> from the filing of a charge by another employee with respect to his
> denial of the same position.  The "piggy-back" rule references a
> court-made exception to the requirement that an individual
> claimant must timely exhaust his administrative remedies before
> being allowed to file suit.  *See Horton v. Jackson County Bd. of
> County Com'rs.*, 343 F.3d 897, 899 (7th Cir. 2003).  This exception
> is based on the theory that, if the claim implicates the same
> conduct complained of by one person who did raise the alleged
> discrimination in his charge, that should suffice as to all such
> potential claimants because the purpose of the charge-filing
> requirement - namely, to provide an opportunity for the agency to
> facilitate a resolution - has been satisfied. *Id.* Plaintiffs maintain
> that especially in a disparate impact case such as this, that rule is
> appropriate.

>     We are prepared to apply that exception to the general rule with
> respect to claims arising out of the test requirement itself, since
> there the claim and the remedy are one and the same.  All
> employees seeking inter-division transfers who were made to take a
> test which disproportionately favored non-African Americans
> suffered the same wrong and, clearly, the best remedy to that
> wrong would be to enjoin the employer from relying on the test for
> selection purposes in the future.  Additionally, where a single
> Plaintiff continues to have his job bids denied because of the effect
> of his test score(s), so long as he filed a charge complaining of the
> employer's reliance on the test in connection with a job denial, no
> legitimate purpose would be served by requiring that person to file
> additional charges with each successive denial.  However, where
> multiple Plaintiffs are claiming to be qualified for and entitled to
> the same position, a need arises for each individual to assert that
> specific claim in order to permit a resolution to be reached at the
> agency level, if possible.  Consequently, it is our judgment that the
> "piggy-back" rule does not apply to a claim by an individual
> Plaintiff, like Wiggins, who was denied transfer or promotion to a
> job more than 300 days prior to his filing a charge with the EEOC.

*Id.* at p. 27-28.

This analysis of the timeliness of each Plaintiff's claim led us to conclude that each charge was timely with respect to the discriminatory WCA test and, therefore, at a minimum, each Plaintiff was entitled to an order of injunctive relief prohibiting Citizens from ever again using the test or their individualized scores for any employment-related purpose.  However, the decision as to whether any one or more of the remaining Plaintiffs qualifies for more than injunctive relief was left for development at trial.  Based on the evidence adduced at trial, we enter the following findings and conclusions.

### *Findings of Fact*

At trial, the evidence established that two job postings were critical to a determination of whether any Plaintiff was entitled to relief beyond the injunction.  Both postings were made on August 21, 2001.  One  advertised the position of Gas Service Specialist ("GSS") in the Gas Operations Center and the other provided notice of the position of Material Deliveryman at the same location.  Plaintiffs George Douglas, Jr., George Rogers and former Plaintiff Todd Davidson all submitted bids for the GSS position, and Douglas along with Plaintiff Charles Magee applied for the Material Deliveryman job.  Pursuant to the collective bargaining agreement in effect at the time, Citizens was required to post the availability of open or soon to be open bargaining unit positions so that its existing labor force had an opportunity to bid or apply for the positions prior to Citizens hiring from outside its current workforce.  An opening in a

particular division was offered, first, to employees within that division and then to employees in other divisions who had passed the WCA and were qualified for the position.

Most often the WCA was administered in conjunction with or shortly following any job postings which needed to be filled from outside the gas division. An employee could take the test as often as it was offered until he received a passing grade. All of the remaining Plaintiffs in this lawsuit were employed in the manufacturing division, and the relevant job postings for which they were vying were positions in the gas division.

Generally speaking, the cleaner work environment enjoyed by those employed within the gas division of Citizens made it the most popular of the three company divisions for its hourly employees, though Plaintiffs testified that they sought promotions or transfers to the gas division for better pay as well as better working conditions. When an open position was posted for which a bargaining unit employee sought consideration, the employee would fill out a "bid form" to apply. Space was provided on that form for the bidder to summarize his/her experience and qualifications for the particular job as well as his/her seniority date, current position and supervisor.

Trial testimony established that, in 2001, Citizens was offering early retirement to a portion of its workforce, effective at the end of September 2001. Citizens anticipated that several persons holding GSS and Material

Deliveryman jobs would retire, thus creating a need to replace them.  Although

the labor agreements required that employees already working in the gas

division have priority in filling those positions, it was anticipated that, because

of the high number of workers accepting the retirement offers, there would not

be sufficient replacements available from within the division.  Consequently,

job postings for these two jobs were distributed company-wide, but the number

of openings for each job was not specified due to management's uncertainty as

to the precise number of persons currently occupying those positions who

would be accepting the early retirement offers.  This uncertainty, combined

with the requirement that applicants outside the gas division pass the WCA,

caused the procedure used to fill these job openings to include more steps

andextend over a longer period of time than the typical process of filling a

single opening in Citizens' workforce.

Ron Faudree, Distribution Operations Field Administrator, and Robert

Hummel, Vice President for Human Resources, testified that usually a step-

by-step process was followed by Citizens in response to the employee bids

generated by the company-wide gas division job postings.  Certain of those

steps in the process were dictated by contractual provisions and others were

the result of more subjective decision-making.  The procedure followed by

Citizens included the following steps:

1.   Open jobs were offered first to those bidders who were currently
     employed in the gas division and had an acceptable disciplinary
     record.  Gas division employees were not required to take the WCA

and their experience within the division was most often deemed sufficient to render them qualified to move into another position within the same division.

2.   If openings still existed after gas division bidders had accepted offers, Citizens referred to the list of bidders from the two other company divisions who had passed the WCA and who had a seniority date prior to June 28, 1987.  Those hired after June 28, 1987, had no bidding rights under the existing labor contract. If a bidding employee from these two divisions had not passed the WCA or was ineligible based on his hire date, he was preemptively eliminated from consideration with no analysis of his specific qualifications conducted.

3.   After eliminating from consideration those who had not passed the WCA or who had insufficient seniority, the qualifications and disciplinary record of each bidder were considered in order of seniority. Qualifications for a particular job became an issue only if the position was not entry-level.  Thus, if the most senior bidder had sufficient qualifications and no current negative disciplinary record to raise concerns (clearly, a discretionary assessment), that person would be offered the job.  A recent disciplinary infraction could, but most often did not, result in a rejection of the application.

4.   If there were insufficient qualified bidders to fill the open positions, Citizens went outside its existing workforce to fill the remaining openings.  Outside applicants were required to pass the WCA, as well as to demonstrate adequate qualifications for the positions.

### *The August 21, 2001, Posting for Gas Service Specialist (GSS)*

Citizens's gas division oversees its natural gas distribution operations. Most of this work is conducted in the field.  A GSS responds to service issues, such as gas leaks, service shut-offs and turn-ons, meter inspection and maintenance and other similar field operations that involve interactions with customers.  These employees also respond to emergencies.  In 2001, there were

seven levels of hourly positions at the gas division, with level one being the lowest level; the GSS position was listed at level five.  A GSS position was not differentiated by A or B designations and was not regarded as an entry level position.[6]  Pursuant to the collective bargaining agreement in effect in 2002, the GSS trainee position was added as an entry level position.

In response to the August 21, 2001, job posting, Citizens received a total of eighteen bids, five of whom were employees within the gas division, and, though all five were offered positions, only one accepted.  Seven bidders from outside the gas division were rejected because they had insufficient seniority.  Four others were eliminated because they had not passed the WCA, including three of the original Plaintiffs in this lawsuit who were notified of their rejection for the job on September 11, 2001 (a sadly memorable day, to be sure).  One bidder from the manufacturing division with sufficient seniority and an adequate test score turned down the job when it was offered, and one bidder, Louis Drane, (a Caucasian) with a seniority date of July 6, 1984, applied for and accepted the GSS job and transferred to the gas division from his job as a millwright in the manufacturing division.

As the early retirement date of September 30, 2001 approached and Citizens tallied up all the employees who had accepted its early retirement

_____

[6]The letter designation of A or B distinguishes experience and higher pay:  A positions pay more and require greater qualifications and/or experience than the B positions.

offer, it became clear from the level of vacancies that more GSS jobs would need to be filled.  Having already posted the job opening in August 2001, Citizens determined that the posting satisfied the requirement under the collective bargaining agreement and that, given the shortage of in-house eligible or qualified candidates, it was justified in going outside the current workforce to hire "off the street."  Thus, six additional CSS positions were filled on October 1, 2001, from outside applicants who had some type of related employment experience.   During the two months  following the August 21,2001, job posting, Citizens filled a total of eight GSS positions, which number represented more than ten percent of the entire GSS workforce.

### *The August 21, 2001, Posting for Material Deliveryman*

A Material Deliveryman with Citizens operates a truck to transport materials, supplies and equipment to gas distribution operations in the field. The primary task of a material deliveryman is to operate, load and unload the trucks; however, they also patch roads and driveways and assist the work crews as necessary.  This is a level two position -- in other words, not an entry-level position, at least as of 2001 -- and a commercial drivers license ("CDL") was required.  Sometime after 2001, the jobs of Material Deliveryman and Fitter B were combined and became an entry-level position.

Similar to the GSS position, prior to the August 21, 2001, job posting, Citizens was uncertain as to the precise number of Material Deliveryman jobs

that would come open due to retirements.  A total of twenty-two employees bid in response to the announced opening, including seven employees from the gas division: one was offered and accepted the job, three declined the job when it was offered, and three had no CDL and thus were rejected for that reason.  The remaining fifteen bidders came from outside the gas division: ten were eliminated because they had insufficient seniority to have bidding rights, one had no CDL, three (including two Plaintiffs) were rejected because they had failed to pass the WCA, and one rejected the job offer when it was made.  Thus, Citizens filled only one Material Deliveryman position from within the company and was required to hire an additional three people after the early retirement program was fully implemented.  On October 1, 2001, three outside applicants who had worked for one of Citizens's outside installation contractors were hired to fill the remaining positions.

### *Timeliness*

None of the remaining (five) Plaintiffs in this action filed his charge of discrimination with the EEOC within 300 days of being notified that his bid for either or both of the available two positions had been rejected due to his score(s) on the WCA.  None of these Plaintiffs presented evidence at trial that he was rejected for any other jobs within 300 days of their respective charges.  Because no timely charge was filed by any of these Plaintiffs with regard to Citizens's disqualification of them from consideration for the August 21, 2001,

job posting, we conclude that with regard to their entitlements to something more than injunctive relief barring the use of the WCA or their test scores, Plaintiffs' claims jointly and severally fail.  *See National R.R. Passenger Corporation v. Morgan*, 536 U.S. 101 (2002).  This ruling is consistent with our prior analysis as set out in our January 18, 2007, order.

We are confident that this is the appropriate resolution of the timeliness issue,  and that there is accordingly no entitlement to any award of back-pay or other equitable relief by any Plaintiff.  Nonetheless, we concede that in making this ruling, we lack the benefit of any clear precedent.  Thus, we shall examine the merits of Citizens's contention that, regardless of the timeliness of their agency charges, none of the Plaintiffs would have received the positions they had bid upon.

*WILBERT WIGGINS*[7]

Wilbert Wiggins was at the time of trial no longer an employee of Citizens, having been fired in December 2006 for ongoing attendance and performance problems, including a final incident involving his having fallen

_____

[7]We indicated in our January 18, 2007, order that Wiggins was not entitled to any relief beyond the injunction because he had made no timely claim with respect to a specific job he sought and was denied, and he could not "piggy-back" on Davidson's timely charge with regard to the GSS posting in August of 2001.  However, we allowed Wiggins to present evidence and request further relief at trial based upon his assertion that, "but for" his earlier WCA failing scores, he would have applied for and qualified for other jobs.  As indicated previously, Wiggins has provided no evidence that he bid for jobs or would have bid for jobs that were posted during a time period which could have made his charge timely.

asleep at work.  Wiggins began working for Citizens in March of 1985 and was, in 2001, a Yard Utility Person in the manufacturing division.  He testified that in 2001 he wished to work in the gas division but did not bid on either the GSS or Material Deliveryman postings of August 21, 2001.  He contends that he had bid on gas division jobs several times previously and had taken the WCA and its predecessor but each time failed the exam.  By the time of the August 2001 posting, Wiggins had become frustrated and given up on transferring to a job for which passing the WCA was a requirement.  Nevertheless, he seeks in this action an award of back-pay and a back-dated seniority divisional date, claiming that, had it not been for his failing scores on the WCA, he would have bid on and received one of the available GSS positions.

The first problem with Mr. Wiggins's claim is that his actions were not consistent with his allegation that he had given up on taking the screening test.  In fact, Wiggins initially testified at trial that he did bid on the August 21, 2001, GSS posting, but retracted that assertion after having his "recollection refreshed" by his counsel.  Nevertheless, he apparently was not too discouraged to take the WCA test in September of 2001, only a couple of weeks after the deadline for bidding on the GSS position, and to have again taken it in December of that year.  In fact, prior deposition testimony by Wiggins indicates that he did not give up on taking the WCA until March of 2002.  In addition, other evidence establishes that he had bid on gas division jobs as early as February 2001.  We therefore conclude that it was not because of any feelings

of discouragement on Wiggins's part due to his having failed the WCA that he was kept from applying for the GSS position.  Thus, his claim for back-pay lacks any evidentiary basis; though he did bid on other jobs, he did not bid on the August 21, 2001, GSS job posting.  Wiggins' claim is thus denied.


*KENTON SMITH*

Kenton Smith began working in the manufacturing division at Citizens in July 1984 and was a By-Product Operator in that division at the time of the August 21, 2001, gas division job postings.  Like Mr. Wiggins, he did not submit a bid on either job, though he testified at trial that he was eager to move to the gas division.  He claims that he took the WCA (more accurately, its predecessor version) several times in the 1990's, but gave up on taking it when he consistently was unable to pass it.  In his testimony at trial, he said that, had he passed the test, he would have applied for the GSS job posting in August of 2001.  Documentary evidence revealed that Kenton Smith did take but failed the WCA in December 2001, but this was after the GSS positions had already been filled.  In August 2007, after the WCA had been discontinued, Smith had successfully bid on the new GSS trainee position, which is the job he held at the time of trial.  He now seeks back-pay and a back-dated divisional seniority date.

Kenton Smith's claim fails for the reason that he never took the WCA, that being the only test determined to be discriminatory, until well after the gas division positions posted in August of 2001 were filled.  He contends that this should not matter in the sense of disqualifying him from additional relief because everyone referred to both of the screening tests that had been in use over the years as the "baseline test" and he was unaware of any difference. While it is true that the terms "baseline test" and "WCA" were apparently often used interchangeably by many hourly and management employees, it is unequivocally true that only the WCA has been determined by the Court to have had a discriminatory impact on those African-Americans who had taken it and failed to pass.  No such ruling was made with regard to the predecessor test.  Thus, because Kenton Smith failed the WCA  well after the positions he says he was qualified for and should have received were filled by others, his claim for additional relief must also be denied.

*GEORGE ROGERS*

George Rogers began his employment with Citizens in September 1981 and as of the date of trial remained a member of the general labor pool at the gas division, the labor pool having been formed following Citizens's closure of its manufacturing division  He was a Mason A in the manufacturing division at the time of the August 2001 gas division job postings.  Unlike Wilbert Wiggins or Kenton Smith, Mr. Rogers did submit a bid when the gas division posted the

GSS position on August 21, 2001, and he took and failed the WCA the following day.  On September 11, 2001,  he was informed that he did not qualify to receive the GSS position.  Like other Plaintiffs, his charge of discrimination was not filed with the EEOC within 300 days following that denial, which, as we have previously ruled, dooms his claim for specific relief due to the job denial.  However, Citizens claims he would not have received the job even if there had been no requirement that he pass the WCA, which defense we examine further below.

Citizens's first argument in response to Rogers's claim is the same as that advanced with regard to all the other Plaintiffs who bid for the GSS job posting in August 2001: namely, that the two GSS jobs filled in September 2001 from within the existing workforce are the only ones at issue here, since those were the only two jobs filled as a result of the August 21, 2001, GSS posting.  Therefore, even if Rogers's charge had been timely, he and his co-Plaintiffs must be able to establish that they were more senior and would have received the job ahead of any others.  However, it is clear from the testimony of Citizens's own witnesses that the six GSS positions filled on October 1, 2001, by outside hires were in fact covered, at least contractually, by the in-house posting in August and that, had there been no requirement of passing the WCA, the qualifications of those bidders who were eliminated for failing scores would have been examined prior to Citizens going outside the company to fill the positions.  All of the Plaintiffs who bid the GSS job posting had sufficient

seniority to have qualified to be one of the first six bidders in line for the GSS jobs, which would have put them ahead of any of the outside hires. Accordingly, we must focus our analysis on whether Rogers, or any of the other Plaintiffs, would have been denied the opportunity to fill one of the <u>eight</u> GSS positions covered by that posting for a reason other than their failure to pass the WCA.

We know that the first GSS opening was filled by David Sharp who, as a gas division employee, received that slot without regard to anything that happened relating to any applicants from outside the division. Louis Drane, a manufacturing division employee, filled the second opening; his seniority date of July 6, 1984, put him behind George Rogers with respect to Citizens's analysis of his qualifications and current disciplinary status, but Citizens contends that Rogers had neither the qualifications nor the blemish-free disciplinary record which would have qualified him for the GSS position at that time.

Regarding Rogers's disciplinary record, Citizens utilized a "stepped" disciplinary process, which typically began with a verbal warning. Discipline once meted out would remain on an hourly employee's current record for twelve months. Rogers had received a verbal warning--the first disciplinary step--on June 18, 2001, for failing to perform his duties in a safe manner, towit, he had failed to adjust a valve intended to allow equipment to pass safely

by an oven, which infraction caused fire damage to a piece of equipment.

Ron Faudree, the gas division management employee responsible for identifying and filling the available jobs in the gas division, testified that the use of a current disciplinary record to disqualify a job applicant was essentially a discretionary matter and, though he could recall a prior instance in which a gas division employee was disqualified from obtaining an open position, he could not recall an individual seeking a transfer from manufacturing to a gas division job ever being disqualified based upon a negative disciplinary record.

Safety, as explained at trial, is a matter of utmost concern with regard to gas distribution jobs. Citizens maintains that a safety-related disciplinary warning such as the one received by Mr. Rogers likely would have disqualified him from a GSS position.  We remained unconvinced by this assertion with respect to Mr. Rogers' disciplinary record, even though we recognize and accept the paramount role that safety plays with regard to Citizens's gas distribution activities.  The lack of any previous disqualification of a bidder from the manufacturing division based on a disciplinary infraction causes us to conclude that Rogers would not have been disqualified either from the GSS position solely because he received the first-step verbal warning.

That said, there is another safety related concern raised by Citizens that

we find to be more persuasive.  In the "experience and qualifications" section of the bid form, George Rogers wrote "masonry work and pipefitter work."  His trial testimony confirmed that at the time he bid on the GSS position he had little background experience which qualified him for that type of work.  That Louis Drane, the manufacturing division employee who had passed the WCA and was awarded one of the GSS jobs, had a comparable lack of qualifications and experience, is not necessarily inconsistent with Citizens's criticisms of Rogers's qualifications, however.  Drane's bid form admittedly had included no particularly relevant experience, and Ron Faudree conceded that, after Drane was awarded the job, he had to receive significant training before he was capable of performing all the relevant tasks.  Plaintiffs contend that Drane's lack of experience demonstrates that specific job qualifications and experience were actually irrelevant in terms of being awarded the position, but that argument fails to take into account the particular circumstances that existed at the time that Drane was awarded the job.

By the time the decision was made to offer the GSS job to Drane, all applicants who had not passed the WCA had been eliminated from consideration, and every bidder from the gas division, other than David Sharp, had turned down the job offer.  Thus, Citizens knew it would have to go outside the company to fill the additional GSS opening because, under the procedures in place at that time, it had available for consideration only one qualified gas division bidder and Drane who otherwise qualified as an in-house replacement

-22-

for what Citizens managers knew would be considerably more than two openings. As Faudree testified, there was no trainee position for GSS and there was no contractual requirement under the CBA that one be created. Citizens determined that it could take on the training responsibility for one person who lacked experience, but only because the experience level of those hired from outside would reduce the amount of training actually required. Those hired "off the street" typically had experience in HVAC or other areas of construction that involved gas appliances or gas line venting. Had there been no requirement that applicants pass the WAC and had Citizens been forced to train more inexperienced or unqualified in-house bidders, Faudree testified that he believed they could not have taken on even one additional employee who required such training, given that they were needing to replace more than ten percent of the GSS workforce. This situation would have presented major public safety concerns, both with regard to the entry on duty of numerous untrained individuals and the reduced availability of experienced individuals in the field whose services would have necessarily been diverted in order to train the inexperienced replacements.

Faudree's testimony in this regard is highly persuasive. In fact, in light of the collective bargaining agreement requirement that the assessment of applicant qualifications be consistent with regard to the awarding of jobs, it is more likely that, but for the exigent circumstances confronting Faudree and the others at Citizens charged with making these hiring decisions, Mr. Drane's

bid would also have been turned down along with others who were not experienced or qualified for GSS jobs.[8]  Again, as Faudree testified, if no in-house person with the appropriate qualifications for a job was available, Section 13.2.5 of the applicable labor contract gave Citizens the right to fill the position in any manner it saw fit.  If Citizens had determined, after applying a consistent assessment of applicant qualifications, that no Citizens employees from outside the gas division were qualified, Section 13.2.5 of the contract would have allowed Citizens to hire from outside to fill all remaining GSS positions.

Thus, we conclude that, even if passing the WCA had not been a requirement for a manufacturing employee to fill one of the GSS positions posted on August 21, 2001, George Rogers would not have been qualified nor would he have received the job.  Three of the manufacturing employees who had bid on the job and had greater seniority than Rogers had a lack of experience similar to his.  Because the collective bargaining agreement required a consistent assessment of qualifications and because the labor agreement did not provide for a training position but did allow Citizens to go outside the

---

[8]Viewed in the order of the most seniority utility-wide, from the highest to the least, those outside the gas division with sufficient seniority who bid on the GSS job were: (1) Michael Bralock, (2) Todd Davidson, (3) Paul McKain, (4) George Rogers, (5) George Douglas, Jr., and (6) Louis Drane. None of these individuals had experience in gas distribution and, while several claimed to be eager to be trained, none listed experience or qualifications on their bid forms which indicated that they could have performed the listed functions of the GSS position without considerable training.

company to obtain qualified replacements, public safety concerns would have prevented Citizens from putting all of these inexperienced individuals into GSS positions.  Rogers is therefore not entitled to the additional relief he seeks in this action.

*GEORGE DOUGLAS, JR.*

George Douglas, Jr. bid on both the GSS and the Material Deliveryman positions in August of 2001 and, as was true of all the other Plaintiffs, he also was informed in September 2001 that he had been denied both positions due to his failure to successfully pass the WCA exam.  He was a Mason A in the manufacturing division at the time he bid on the gas division jobs; his employment with Citizens had begun in July 1982.  In June 2007, he moved to the gas division as a Fitter B/Hauler.  He quickly moved up to a Machine Operator B position and, as of the time of trial, he was in training to become a Machine Operator A.  He does not seek appointment to the GSS job as a remedy in this litigation because he prefers his current position; however, he does seek back-pay and a back-dated divisional seniority date.  His EEOC charge, as we have previously ruled, was not filed within 300 days of his having been denied either of the two positions for which he applied in August 2001.

 Though Citizens disqualified Douglas on the basis of his WCA score, his

eligibility for the Material Deliveryman position would not have survived in any event because he did not possess a CDL.  The evidence adduced at trial made clear that even gas division employees were refused the Material Deliveryman job at that time if they did not possess a CDL.  In fact, in their post-trial brief, Plaintiffs admit that a successful bidder was required to have this special driver's license at the time he bid on the Material Deliveryman position in order to fully qualify for the job.

Regarding the GSS position, Douglas listed no qualifications in the appropriate portion of the bid form and at trial he provided virtually no evidence to show that he met the listed qualifications for the GSS job as of the date it was posted.  As with Rogers, Drane and the three bidders from the manufacturing division with the greatest seniority, Douglas would have required significant training in order to satisfy Citizens's legitimate public safety concerns.   We hold, therefore, for the same reasons justifying our conclusions with regard to Rogers that the evidence does not suffice to show that Douglas would have obtained the GSS position at the time it was posted,even if the WCA had played no role in that determination by Citizens. He thus has shown no entitlement to relief beyond the injunction.


*Charles Magee*

Citizens hired Charles Magee in June 1987.  He worked in the manufacturing division as a Preventative Maintenance Mechanic from March 1994 until the division was closed in the summer of 2007.  At the time of trial, he was a member of the gas division labor pool, hoping to land a permanent position before the labor pool expired during the summer of 2009.  In August 2001, Magee bid on the Material Deliveryman position posting for the gas division, but had failed the WCA.  He was denied the Material Deliveryman job on September 11, 2001, because of his failing score on the WCA.  He did not file his EEOC charge within 300 days of being denied that job.

In determining whether Magee would have been awarded a Material Deliveryman job even if the WCA had not been a part of the process, we undertake an analysis similar to that performed with regard to the GSS job posting.  Citizens claims we should limit our consideration to the single Material Deliveryman opening that was filled from within the company which granted gas division bidders priority over anyone from manufacturing. However, the Material Deliveryman posting, in similar fashion to the GSS posting, provided Citizens contractual permission to bring in the three "experienced" outside hires it had selected on October 1, 2001.  The issue of whether Magee possessed the experience and qualifications necessary to have been awarded the job prior to Citizens looking outside the utility, assuming the WCA had played no role in the process, must be answered affirmatively.

Only three bidders for the Material Deliveryman job were turned down based upon WCA scores.  One of those, George Douglas, Jr., did not possess a CDL and would not have been eligible to receive the job.  Charles Magee did have his CDL.  Paul McKain, who was also denied the job on the basis of his score on the WCA, was more senior than Magee but had not indicated, in the qualifications portion of the bid form, that he possessed a CDL as Magee had. In addition, prior to working for Citizens, Magee had experience working on an asphalt crew and testified that he had performed many, if not most, of the listed duties of a Material Deliveryman.  Citizens was not favorably impressed by what it regarded as the outdated experience upon which Magee relied in establishing his qualifications and also raised again the issue of safety, noting that the Material Deliveryman position was not an entry level position and that individuals in that role were required to assist the crew with gas line piping repairs and other critical and sometimes dangerous activities.  In addition, each of the three individuals who were hired from outside the company had had experience in gas distribution, having worked for a contractor that performed gas pipe installation work for the utility.

While we believe that Citizens's emphasis on safety is legitimate, the evidence they offered with regard to Magee's lack of prior direct experience as a Material Deliveryman is not ultimately convincing.  Given that Citizens was

willing to allow the admittedly unqualified Louis Drane to fill one of eight GSS jobs because, at the time, it could only provide significant training to one of the eight people who would fill the open spots, and given the CBO requirement that it apply a consistent assessment standard in evaluating the qualifications of employees within its workforce, we are convinced that Citizens would have selected Magee to fill one of the four Material Deliveryman openings, due to his having had at least some relevant experience for the position, even though he likely would have required additional training.

Unfortunately, however, for Mr. Magee this finding does not open the door to the relief he seeks because, as we have discussed, his EEOC charge was timely only with regard to his having been required to take and pass the WCA, not to his having been denied a specific job. Only if he had filed a timely charge or if, by law, he was permitted to "piggy-back" on the charge of another would he potentially be entitled to an additional award of equitable relief. But, as we have shown, that is not the case and he is entitled to no relief beyond the injunctive relief we have previously awarded.

### Injunctive Relief

Prior to this litigation, a conciliation agreement with Citizens was negotiated by the EEOC,  which included a prohibition against any further use

-29-

of the WCA. In addition, Citizens voluntarily ceased using any form of screening test.  Regretably, a final resolution of this case had been long in coming, but with regard to the Court's issuance of final injunctive relief, no prejudice has resulted from this delay because of Citizens's voluntary forbearance.  Having reached the point now where the only action remaining for the Court to take is to enter an injunction, we do so, while deferring Plaintiffs' petition for attorneys fees and an award of costs for subsequent consideration.  We encourage the parties to confer within thirty (30) days of the date of this order in an effort to reach an agreement on these remaining issues. To the extent the parties do not achieve a negotiated resolution of them, a request should be made to the assigned Magistrate Judge for assistance in resolving the remaining issues.  Thereafter, should these issues persist, the undersigned judge should be notified forthwith so an appropriate schedule can be set to meet.

### *Conclusion*

Because none of the remaining Plaintiffs filed a timely charge of discrimination with the EEOC with respect to the denial of or transfer to a specific position in the gas division at Citizens, recovery for the unintended discriminatory impact of Citizens's reliance upon the WCA shall be and is hereby limited to injunctive relief barring Citizens from any and all future use of or reliance on the WCA, or the Plaintiffs' test scores for any purpose.

Citizens is further enjoined from creating, imposing, requiring or otherwise instituting a similar screening test relating to job transfers, promotions, or entitlement to advancement.

**IT IS SO ORDERED**

Date:   06/03/2009

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Wayne O. Adams III
ICE MILLER LLP
wayne.adams@icemiller.com

Robert David Eaglesfield III
PRICE WAICUKAUSKI & RILEY
deaglesfield@price-law.com

Susannah M. Pieper
ICE MILLER LLP
susannah.pieper@icemiller.com

Henry J. Price
PRICE WAICUKAUSKI & RILEY
hprice@price-law.com

William N. Riley
PRICE WAICUKAUSKI & RILEY
wriley@price-law.com

Ronald J. Waicukauski
PRICE WAICUKAUSKI & RILEY

rwaicukauski@price-law.com